CLOSED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

DOC # 155

UNITED STATES OF AMERICA          :

        -v-          :

(#5) BERNARD J. EBBERS and          :
(#1) SCOTT D. SULLIVAN,

                   :

        Defendants.          :

- - - - - - - - - - - - - - - - - -x

**INDICTMENT**

S2 02 Cr. 1144 (BSJ)

U.S. DISTRICT COURT
FILED
MAR 0 1 2004
S.D. OF N.Y.

<u>COUNT ONE</u>

(Conspiracy To Commit Securities Fraud)

      The Grand Jury charges:

<u>RELEVANT PERSONS AND ENTITIES</u>

      1.   At all times relevant to this Indictment,
WorldCom, Inc. ("WorldCom") was a corporation organized under the
laws of the State of Georgia with its headquarters in Clinton,
Mississippi.

      2.   At all times relevant to this Indictment,
WorldCom's common stock was listed under the symbol "WCOM" on the
NASDAQ National Market System, an electronic securities market
system.  As of May 31, 2002, WorldCom's largest institutional
shareholders included Bernstein Investment Research and
Management, Oppenheimer Capital, Merrill Lynch Investment
Managers, and College Retirement Equities Fund, all of which
maintained offices in New York, New York.

MICROFILM
MAR - 2 2004
9:00 AM

3.   At all times relevant to this Indictment, BERNARD J. EBBERS, the defendant, served as Chief Executive Officer, President, and a director of WorldCom.  At all times relevant to this Indictment, EBBERS signed the Annual Reports on Form 10-K that WorldCom filed with the United States Securities and Exchange Commission (the "SEC").  At all times relevant to this Indictment, EBBERS owned millions of shares, and options to purchase shares, of WorldCom common stock.

4.   At various times relevant to this Indictment, SCOTT D. SULLIVAN, the defendant, served as Chief Financial Officer, Treasurer, and Secretary of WorldCom.  At all times relevant to this Indictment, SULLIVAN directed the preparation of and signed the Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q that WorldCom filed with the SEC.

## BACKGROUND

### WorldCom's Business

5.   At all times relevant to this Indictment, WorldCom provided to businesses and consumers around the world a broad range of communications services, including, among other things, data transmission services, Internet-related services, commercial voice services, international communication services, long distance service, and other telecommunication services.  WorldCom owned and operated extensive global network facilities, which spanned six continents, reached every major city center in the

2

world, and connected more than 60,000 buildings.  WorldCom's
global network included more than 90,000 route miles of
terrestrial and undersea fiber-optic cable.  This network was
designed to support the largest array of data communication
products and services in the world.

6.   At all times relevant to this Indictment, to serve
customers that were not directly connected to its network,
WorldCom paid fees to use or lease facilities and connections
from other telecommunication companies.  These fees, known as
"line costs," were WorldCom's largest expense.

## WorldCom's Communications With The Investing Public

7.   At all times relevant to this Indictment, BERNARD
J. EBBERS and SCOTT D. SULLIVAN, on behalf of WorldCom, provided
members of the investing public with information concerning
WorldCom's financial results and operating performance.  EBBERS
and SULLIVAN provided such information through various methods,
including in WorldCom's public filings with the SEC, in periodic
news releases and other corporate announcements, in statements
made in conference calls with professional securities analysts
and investors, and in meetings and conferences held with analysts
and investors in New York, New York and elsewhere.  Members of
the investing public considered and relied upon the information
provided by EBBERS and SULLIVAN in deciding whether to purchase,
hold, or sell WorldCom securities.

8.   Part of the information routinely provided by
BERNARD J. EBBERS and SCOTT D. SULLIVAN to members of the
investing public was so-called "guidance" concerning WorldCom's
operational and financial results for upcoming reporting periods.
The "guidance" provided by EBBERS and SULLIVAN concerned various
measures of WorldCom's operational and financial performance,
including its expected cash earnings per share ("EPS"), "Earnings
Before Interest, Taxes, Depreciation, and Amortization"
("EBITDA"), net income, expenses, revenue growth, and capital
expenditures.

9.   At all times relevant to this Indictment, numerous
securities analysts and investors relied on the "guidance"
provided by BERNARD J. EBBERS and SCOTT D. SULLIVAN to gauge
WorldCom's performance, to predict WorldCom's expected earnings,
and to disseminate estimates of WorldCom's expected performance
to the larger investing public.  Members of the investing public
closely followed such "earnings estimates" or "analysts'
expectations" because, historically, when company earnings fail
to meet such estimates, company stock prices typically decline,
and when company earnings exceed such estimates, company stock
prices typically rise.

### WorldCom's Financial Reporting Process

10.  At all times relevant to this Indictment, at the
close of each month and each quarter of WorldCom's fiscal year,

4

employees in WorldCom's financial and accounting departments
collected and summarized information reflecting WorldCom's
operating performance and financial results for the particular
period in question.  This information was reflected in various
financial statements and reports.

11.  At all times relevant to this Indictment, WorldCom
tracked its revenue on a monthly basis through the use of a
report referred to internally as "MonRev."  BERNARD J. EBBERS
designed MonRev to allow himself, SCOTT D. SULLIVAN, and other
WorldCom officers to review the revenue generated by each of
WorldCom's sales channels, including "Major Nationals,"
"Wholesale," "Global," "Mass Markets," "International," and
"Specialized Sales."  Revenue that was not generated through
these sales channels was tracked separately and classified in
MonRev as "Corporate Unallocated."  Members of WorldCom's Revenue
Accounting Department prepared MonRev each month and provided it
to EBBERS, SULLIVAN, and others.  EBBERS carefully scrutinized
every MonRev report.  Unlike all other recipients of MonRev,
EBBERS demanded that his copy be printed on a special "green-bar"
computer paper to facilitate his review.  EBBERS and SULLIVAN
regularly met to discuss the results reported in MonRev.

12.  At all times relevant to this Indictment, WorldCom
tracked its Selling, General, and Administrative expenses
("SG&A") on a monthly and quarterly basis through its "Management

5

Budget Variance Report."   Members of WorldCom's General
Accounting Department prepared the Management Budget Variance
Report each month and provided it to BERNARD J. EBBERS, SCOTT D.
SULLIVAN, and others.   EBBERS and SULLIVAN regularly met to
discuss the results reported in the Management Budget Variance
Report.

        13.   At all times relevant to this Indictment, WorldCom
tracked expenses relating to its line costs on a quarterly basis
through the preparation of a preliminary income statement.
Members of WorldCom's General Accounting Department prepared a
preliminary income statement each quarter and provided it to
SCOTT D. SULLIVAN and others.   SULLIVAN, in turn, provided these
preliminary income statements to BERNARD J. EBBERS.   At the close
of each financial reporting period, EBBERS and SULLIVAN met to
discuss WorldCom's preliminary operating results, including
WorldCom's line cost expenses.

        14.   At all times relevant to this Indictment,
WorldCom's senior management participated in periodic meetings to
discuss expectations regarding WorldCom's operating results for
the upcoming months.   In connection with these so-called
"Outlook" meetings, BERNARD J. EBBERS and SCOTT D. SULLIVAN,
among others, reviewed documents that summarized anticipated
events that would affect WorldCom's revenues in the following
months.   EBBERS and SULLIVAN regularly met to discuss the

financial results and projections reflected in the various
documents presented during the "Outlook" meetings.

### THE SCHEME TO DEFRAUD

#### Introduction

15.  As set forth more fully below, from in or about
September 2000 through in or about June 2002, BERNARD J. EBBERS,
SCOTT D. SULLIVAN, and their co-conspirators engaged in an
illegal scheme to deceive members of the investing public,
WorldCom shareholders, securities analysts, the SEC, and others,
concerning WorldCom's true operating performance and financial
results.

16.  As BERNARD J. EBBERS, SCOTT D. SULLIVAN, and their
co-conspirators knew, by no later than in or about September
2000, WorldCom's true operating performance and financial results
were in decline and had fallen materially below analysts'
expectations.  EBBERS nevertheless insisted that WorldCom
publicly report financial results that met analysts'
expectations.  As a result, rather than disclosing WorldCom's
true condition and suffer the ensuing decline in the price of
WorldCom's common stock, SULLIVAN, with EBBERS's knowledge and
approval, directed co-conspirators to make false and fraudulent
adjustments to WorldCom's books and records.

17.  Thereafter, from in or about September 2000
through in or about June 2002, for the purpose of disguising

7

WorldCom's true operating performance and financial results, EBBERS, SULLIVAN, and their co-conspirators caused WorldCom's reported figures for revenue, SG&A and line cost expenses, EBITDA, depreciation expense, net income, and EPS to be falsely and fraudulently manipulated.  As EBBERS, SULLIVAN, and their co-conspirators knew, the aggregate effect of these adjustments, which were made in round-dollar amounts and consistently totaled hundreds of millions of dollars per quarter, was to present a materially false and misleading picture of WorldCom's true operating performance and financial results.

18.   From in or about September 2000 through in or about June 2002, in furtherance of the scheme, BERNARD J. EBBERS, SCOTT D. SULLIVAN, and their co-conspirators made repeated public statements in which they (a) falsely described WorldCom's operating performance and financial results, (b) omitted to disclose material facts necessary to make the statements that they made about WorldCom's operating performance and financial results complete, accurate, and not misleading, and (c) caused WorldCom to file financial statements with the SEC that presented a materially false and misleading description of WorldCom's operating performance and financial results.   Through this scheme, EBBERS, SULLIVAN, and their co-conspirators inflated and maintained artificially the price of WorldCom common stock.

8

19.   On or about June 25, 2002, WorldCom announced
that, as a result of an internal investigation, it would have to
issue restated financial statements.  In the days following this
announcement, the price of WorldCom's common stock plummeted more
than 90%, resulting in an aggregate decline in shareholder value
of more than $2 billion.

## The Fraudulent Adjustments To WorldCom's Books And Records

20.   In or about September 2000, after reviewing MonRev
and other documents summarizing WorldCom's financial results and
operating performance for July and August 2000, SCOTT D. SULLIVAN
advised BERNARD J. EBBERS that WorldCom's operating performance
and financial results had deteriorated, and that WorldCom's
earnings for the upcoming reporting period would not meet
analysts' expectations.  SULLIVAN further advised EBBERS that
WorldCom should issue an "earnings warning" to alert the
investing public about WorldCom's deteriorating financial
performance.  EBBERS refused to issue an earnings warning.
Instead, EBBERS and SULLIVAN agreed to take steps to conceal
WorldCom's true financial condition and operating performance
from the investing public.

21.   In or about October 2000, rather than disclosing
WorldCom's true financial condition and operating performance,
BERNARD J. EBBERS and SCOTT D. SULLIVAN instructed subordinates,
in substance and in part, to falsely and fraudulently book

9

certain entries in WorldCom's general ledger, which were designed
to increase artificially WorldCom's reported revenue and to
decrease artificially WorldCom's reported expenses, resulting in,
among other things, artificially-inflated figures for WorldCom's
EPS, EBITDA, and revenue growth rate.  The adjustments included
(a) reductions made to line cost expense accounts by debiting
certain reserve and liability accounts, which reductions lacked
any business justification or supporting documentation, and (b)
increases to revenue, which in light of their departure from
prior revenue recognition policies, and in light of their
aggregate amount, made WorldCom's reported revenue materially
misleading.  EBBERS and SULLIVAN instructed others to make these
adjustments solely in an effort to report results that would
satisfy analysts' expectations, even though EBBERS and SULLIVAN
knew that WorldCom's true results in fact failed to meet those
expectations.

22.   In or about January 2001, BERNARD J. EBBERS and
SCOTT D. SULLIVAN again determined that WorldCom's financial
results for the fourth quarter of 2000 would not meet analysts'
expectations.  Rather than disclose WorldCom's true financial
condition and operating performance, in or about February 2001,
EBBERS and SULLIVAN instructed subordinates, in substance and in
part, to falsely and fraudulently book certain entries in
WorldCom's general ledger, which were designed to increase

10

artificially WorldCom's reported revenue and to decrease
artificially WorldCom's reported expenses, resulting in, among
other things, artificially-inflated figures for WorldCom's EPS,
EBITDA, and revenue growth rate.  These adjustments included (a)
reductions made to line cost expense accounts by debiting certain
reserve and liability accounts, which lacked any business
justification or supporting documentation, and (b) increases to
revenue, which in light of their departure from prior revenue
recognition policies, and in light of their aggregate amount,
made WorldCom's reported revenue materially misleading.  EBBERS
and SULLIVAN instructed others to make these adjustments solely
in an effort to report results that would satisfy analysts'
expectations, even though EBBERS and SULLIVAN knew that
WorldCom's true results in fact failed to meet those
expectations.

      23.  In or about March 2001, BERNARD J. EBBERS and
SCOTT D. SULLIVAN determined that WorldCom's financial results
for the first quarter of 2001 would not meet analysts'
expectations.  SULLIVAN advised EBBERS, in substance and in part,
that members of WorldCom's General Accounting Department could no
longer reduce line cost expense accounts by debiting certain
reserve and liability accounts, as they had done previously.
Instead, SULLIVAN advised EBBERS, in substance and in part, that
members of WorldCom's General Accounting Department would

transfer line cost expenses to capital expenditure accounts.
SULLIVAN advised EBBERS, in substance and in part, that these
transfers were being made to keep WorldCom's expenses-to-revenue
ratio in line with figures reported in previous periods and in an
effort to meet analysts' expectations for WorldCom's net income,
EPS, and EBITDA.

        24.  In or about March 2001, SCOTT D. SULLIVAN
instructed members of the General Accounting Department to make
journal entries in WorldCom's general ledger, which resulted in
the transfer of hundreds of millions of dollars from line cost
expense accounts to capital expenditure accounts.  SULLIVAN's
instructions were communicated, and the journal entries affecting
the transfers were made, after WorldCom's field offices' books
were closed for the quarter.  EBBERS and SULLIVAN instructed
others to make these adjustments solely in an effort to satisfy
analysts' expectations, including those regarding WorldCom's net
income, EPS, and EBITDA, even though EBBERS and SULLIVAN knew
that WorldCom's true results in fact failed to meet those
expectations.  As described more fully below, SULLIVAN directed
similar line cost transfers in each of the quarters from March
2001 through March 2002, resulting in improper transfers totaling
approximately $3.8 billion.

        25.  In or about June 2001, BERNARD J. EBBERS and SCOTT
D. SULLIVAN determined that WorldCom's financial results for the

second quarter of 2001 would not meet analysts' expectations.  In
or about July 2001, rather than disclose WorldCom's true
operating performance and financial condition, EBBERS and
SULLIVAN instructed subordinates, in substance and in part, to
falsely and fraudulently book certain entries in WorldCom's
general ledger, which were designed to increase artificially
WorldCom's reported revenue and to decrease artificially
WorldCom's reported expenses, resulting in, among other things,
artificially inflated figures for WorldCom's EPS, EBITDA, and
revenue growth rate.  These adjustments included (a) the improper
capitalization of line cost expenses, and (b) increases to
revenue, which in light of their departure from prior revenue
recognition policies, and in light of their aggregate amount,
made WorldCom's reported revenue materially misleading.  With
respect to these revenue adjustments, WorldCom created a process,
referred to internally as "Close the Gap," designed solely to
identify adjustments that would increase reported revenue in an
effort to satisfy analysts' expectations.  EBBERS and SULLIVAN
both participated extensively in the "Close the Gap" process.
EBBERS and SULLIVAN instructed others to make these adjustments
solely in an effort to report results that would satisfy
analysts' expectations, even though EBBERS and SULLIVAN knew that
WorldCom's true results in fact failed to meet those
expectations.

26.   In or about September 2001, BERNARD J. EBBERS and
SCOTT D. SULLIVAN determined that WorldCom's financial results
for the third quarter of 2001 would not meet analysts'
expectations.  Rather than disclose WorldCom's true operating
performance and financial condition, in or about October 2001,
EBBERS and SULLIVAN instructed subordinates, in substance and in
part, to falsely and fraudulently book certain entries in
WorldCom's general ledger, which were designed to increase
artificially WorldCom's reported revenue and to decrease
artificially WorldCom's reported expenses, resulting in, among
other things, artificially inflated figures for WorldCom's EPS,
EBITDA, and revenue growth rate.  The adjustments included (a)
the improper capitalization of line cost expenses, and (b)
increases to revenue, which in light of their departure from
prior revenue recognition policies, and in light of their
aggregate amount, made WorldCom's reported revenue materially
misleading.  With regard to the revenue adjustments, EBBERS and
SULLIVAN, through the "Close the Gap" process, caused WorldCom to
report publicly revenue growth of approximately 12 percent, even
though WorldCom's true operating performance yielded revenue
growth of approximately 6 percent.  EBBERS and SULLIVAN
instructed others to make these adjustments solely in an effort
to report results that would satisfy analysts' expectations, even
though EBBERS and SULLIVAN knew that WorldCom's true results in

14

fact failed to meet those expectations.

27.   In or about January 2002, BERNARD J. EBBERS and
SCOTT D. SULLIVAN determined that WorldCom's financial results
for the fourth quarter of 2001 would not meet analysts'
expectations.  Rather than disclose WorldCom's true operating
performance and financial condition, in or about February 2002,
EBBERS and SULLIVAN instructed subordinates, in substance and in
part, to falsely and fraudulently book certain entries in
WorldCom's general ledger, which were designed to increase
artificially WorldCom's reported revenue and to decrease
artificially WorldCom's reported expenses, resulting in, among
other things, artificially inflated figures for WorldCom's EPS,
EBITDA, and revenue growth rate.  These adjustments included (a)
the improper capitalization of line cost expenses, and (b)
increases to revenue, which in light of their departure from
prior revenue recognition policies, and in light of their
aggregate amount, made WorldCom's reported revenue materially
misleading.  EBBERS and SULLIVAN instructed others to make these
adjustments solely in an effort to report results that would
satisfy analysts' expectations, even though EBBERS and SULLIVAN
knew that WorldCom's true results in fact failed to meet those
expectations.

28.   In or about March 2002, BERNARD J. EBBERS and
SCOTT D. SULLIVAN determined that WorldCom's financial results

15

for the first quarter of 2002 would not meet analysts'
expectations.  Rather than disclose WorldCom's true operating
performance and financial condition, in or about April 2002,
EBBERS and SULLIVAN instructed subordinates, in substance and in
part, to falsely and fraudulently book certain entries in
WorldCom's general ledger, which were designed to increase
artificially WorldCom's reported revenue and to decrease
artificially WorldCom's reported expenses, resulting in, among
other things, artificially inflated figures for WorldCom's EPS,
EBITDA, and revenue growth rate.  These adjustments included (a)
the improper capitalization of line cost expenses, and (b)
increases to revenue, which in light of their departure from
prior revenue recognition policies, and in light of their
aggregate amount, made WorldCom's reported revenue materially
misleading.  EBBERS and SULLIVAN instructed others to make these
adjustments solely in an effort to report results that would
satisfy analysts' expectations, even though EBBERS and SULLIVAN
knew that WorldCom's true results in fact failed to meet those
expectations.

### False Statements And Misleading Omissions
### In WorldCom's SEC Filings

29.  To sell securities to members of the public and
maintain public trading of its securities in the United States,
WorldCom was required to comply with provisions of the federal
securities laws, including the Securities Exchange Act of 1934

and regulations promulgated thereunder, that were designed to
ensure that the company's financial information was accurately
recorded and disclosed to the public.

      30.   Under these securities laws and regulations,
WorldCom was required to, among other things (a) file with the
SEC annual financial statements audited by an independent
accountant; (b) file with the SEC quarterly updates of its
financial statements that disclosed its financial condition and
the results of its business operations for each three-month
period; (c) devise and maintain a system of internal accounting
controls sufficient to provide reasonable assurances that the
company's transactions were recorded as necessary to permit
preparation of financial statements in conformity with Generally
Accepted Accounting Principles and other applicable criteria; and
(d) make and keep books, records, and accounts that accurately
and fairly reflected the company's business transactions.

      31.   At all times relevant to this Indictment,
WorldCom's quarterly and annual financial statements were
transmitted to the New York, New York offices of Merrill
Communications LLC ("Merrill"), a filing agent that assisted
companies in electronically filing periodic reports with the SEC,
and were thereafter transmitted electronically by Merrill or a
Merrill subcontractor, located in New York, New York, to the SEC
for filing.

32.   The quarterly and annual reports filed by WorldCom
for the third quarter of 2000 through the first quarter of 2002
included financial statements that reflected the above-described
fraudulent adjustments to WorldCom's expenses and revenue, which
had been made solely in an effort to satisfy analysts'
expectations.

33.   BERNARD J. EBBERS, SULLIVAN D. SULLIVAN, and their
co-conspirators failed to disclose in WorldCom's SEC filings, or
in any other public statement, the artificial adjustments to
WorldCom's expenses and revenue.  By directing these adjustments
to be made, and falsely concealing the adjustments from the SEC
and members of the investing public, EBBERS, SULLIVAN, and their
co-conspirators disguised WorldCom's true operating performance
and financial condition from the SEC and the investing public.
As a result, EBBERS, SULLIVAN, and their co-conspirators caused
WorldCom to report financial results, which, as EBBERS, SULLIVAN,
and their co-conspirators knew, exceeded by material amounts
WorldCom's actual financial results in each reported period.

### False Statements And Misleading Omissions
### In WorldCom's Public Statements

34.   In statements and presentations made on behalf of
WorldCom to members of the investing public, securities analysts,
and others, BERNARD J. EBBERS, SCOTT D. SULLIVAN, and their co-
conspirators falsely described WorldCom's true operating
performance and financial condition, and omitted to disclose

18

facts necessary to make those statements complete, accurate, and
not misleading.  EBBERS and SULLIVAN (a) made statements about
WorldCom's operating performance and financial condition which,
as they knew, reflected the above-described fraudulent
adjustments to WorldCom's expenses and revenue, and (b) failed to
disclose that they had caused others to manipulate artificially
WorldCom's expenses and revenue in an effort to meet analysts'
expectations.

          35.   Following the close of each reporting period from
the third quarter of 2000 through the first quarter of 2002,
BERNARD J. EBBERS, SCOTT D. SULLIVAN, and their co-conspirators
made statements to the investing public, including on conference
calls held with analysts and investors.  In these statements,
EBBERS and SULLIVAN made materially false statements concerning
WorldCom's financial results and operating performance and
omitted to state facts necessary to make the statements that were
made complete, accurate, and not misleading.  Among the
materially false statements and misleading omissions made by
EBBERS and SULLIVAN were the following:

          a.   On or about October 26, 2000, during a
conference call with analysts, EBBERS made the following
statement, which he knew was false:

               We are pleased with our industry-leading
               incremental revenue growth of $1.1 billion
               this quarter.  Commercial services revenues
               of $6.4 billion is up 19% year-over-year.

And while we continued to hit bumps in the
road in the dial-up Internet business, we did
produce good results in dedicated Internet
and our consumer services businesses.  All in
all, this was a solid quarter for WorldCom.

b.    On or about October 26, 2000, during a

conference call with analysts, SULLIVAN made the following

statement, which he knew was false:

This was another solid quarter for WorldCom.
Cash earnings per share increased 21% to
$0.57 per share.  Earnings per share
increased 27% to $0.47 per share.

c.    On or about February 8, 2001, during a

conference call with analysts, EBBERS made the following

statement, which he knew was false:

On the WorldCom side of the business, we are
sticking with our 12% to 15% revenue growth
guidance for 2001.  Let me restate that.  On
the WorldCom side of the business we are
sticking with our 12% to 15% revenue guidance
for 2001.  That's the range of the average
that we will achieve throughout the year, and
we will be increasing that revenue growth
rate between the first quarter and the end of
the year.

d.    On or about April 26, 2001, during a

conference call with analysts, EBBERS made the following

statement, which he knew was false:

WorldCom is certainly not immune to the
effects of the economy.  We are being
impacted like everyone else.  But, with the
visibility we have in our significant growth
engines, we continue to have confidence in
our ability to achieve our 12 to 15% 2001
growth target on the WorldCom tracker.  And I
guess the thing that always frustrates me

20

> when I hear people talk about visibility as
> it's kind of like landing a plane - how much
> visibility do you really have?  And so I
> thought I would just compare it to a weather
> forecast and say that if we look out for the
> remainder of 2001, we do not see any storms
> on the horizon at this time.

                e.    On or about October 25, 2001, during a

conference call with analysts, SULLIVAN made the following

statement, which he knew was false:

> Let me reiterate the main points Bernie
> [EBBERS] made.  First, we reported a solid
> quarter of double-digit revenue growth in a
> challenging economic climate ....  WorldCom
> Group posted 12% revenue growth in the third
> quarter, with Data & Internet growing at a
> combined rate of 22% this quarter.  Data
> revenues were $2.3 billion and grew 18% in
> the third quarter.

                f.    On or about February 7, 2002, during a

television interview on a CNBC program, EBBERS made the following

statement, which he knew was false:

> The new day is that we're going, we have,
> finally this morning had a chance to put to
> rest all the rumors that have been
> circulating about us.  None of which have
> been true.  We have been a very sound
> financial company.  We've been very
> conservative on our accounting practices and
> we wanted an opportunity for the last couple
> of weeks when we've seen this tremendous loss
> of market capitalization in our stock to be
> able to address the issues.

As EBBERS and SULLIVAN knew, these statements were materially

false and misleading when they were made, because WorldCom's true

financial condition and operating performance, including its

revenue growth rate and EPS, were not as represented.

## THE CONSPIRACY

36.   From in or about September 2000 through in or about June 2002, in the Southern District of New York and elsewhere, BERNARD J. EBBERS, SCOTT D. SULLIVAN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, namely (a) to commit fraud in connection with the purchase and sale of securities issued by WorldCom, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5; (b) to make and cause to be made false and misleading statements of material fact in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; and (c) to falsify books, records, and accounts of WorldCom, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

### Objects Of The Conspiracy

### Fraud In Connection With The
### Purchase And Sale Of Securities

37.   It was a part and an object of the conspiracy that BERNARD J. EBBERS, SCOTT D. SULLIVAN, the defendants, and others

22

known and unknown, unlawfully, willfully, and knowingly, directly
and indirectly, by use of the means and instrumentalities of
interstate commerce, the mails, and the facilities of national
securities exchanges, would and did use and employ manipulative
and deceptive devices and contrivances in connection with the
purchase and sale of securities issued by WorldCom, in violation
of Title 17, Code of Federal Regulations, Section 240.10b-5, by
(a) employing devices, schemes, and artifices to defraud; (b)
making and causing WorldCom to make untrue statements of material
facts and omitting to state material facts necessary in order to
make the statements made, in the light of the circumstances under
which they were made, not misleading; and (c) engaging in acts,
practices, and courses of business which operated and would
operate as a fraud and deceit upon the purchasers and sellers of
WorldCom securities, in violation of Title 15, United States
Code, Sections 78j(b) and 78ff.

### False Statements In
### Annual And Quarterly SEC Reports

38.   It was further a part and an object of the
conspiracy that BERNARD J. EBBERS, SCOTT D. SULLIVAN, the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly, in applications, reports, and documents required
to be filed under the Securities Exchange Act of 1934 and the
rules and regulations thereunder, would and did make and cause to
be made statements that were false and misleading with respect to

23

material facts, in violation of Title 15, United States Code, Sections 78m(a) and 78ff.

### False Books And Records

39.    It was further a part and an object of the conspiracy that BERNARD J. EBBERS, SCOTT D. SULLIVAN, the defendants, and others known and unknown, unlawfully, willfully, and knowingly would and did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Securities Exchange Act of 1934, namely books, records, and accounts of WorldCom, an issuer with a class of securities registered pursuant to the Securities Exchange Act of 1934, which WorldCom was required to make and keep in reasonable detail, accurately and fairly reflecting the transactions and dispositions of the assets of WorldCom, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

### Means And Methods Of The Conspiracy

40.    Among the means and methods by which BERNARD J. EBBERS, SCOTT D. SULLIVAN, and their co-conspirators would and did carry out the conspiracy were the following:

a.    EBBERS and SULLIVAN directed members of WorldCom's Revenue Accounting Department to book entries that increased revenue, solely in an effort to satisfy analysts'

24

expectations, thereby causing, among other things, figures for
WorldCom's publicly reported EPS, EBITDA, revenue growth rate,
and net income to be false and materially misleading.

      b.    With EBBERS's knowledge and approval,
SULLIVAN directed members of WorldCom's General Accounting
Department to book entries that reduced liability and reserve
accounts without supporting documentation or proper business
rationale, thereby falsely inflating, among other things, figures
for WorldCom's publicly reported EPS, EBITDA and net income.

      c.    With EBBERS's knowledge and approval,
SULLIVAN directed members of WorldCom's General Accounting
Department to transfer expenses from line cost accounts to
capital expenditure accounts without business justification or
supporting documentation, thereby falsely inflating, among other
things, figures for WorldCom's publicly reported EPS, EBITDA, net
income, and current assets.

      d.    EBBERS, SULLIVAN, and their co-conspirators
caused WorldCom to file publicly with the SEC quarterly and
annual reports that materially misstated, among other things,
figures for WorldCom's EPS, EBITDA, net income, assets, and
liabilities.

      e.    EBBERS, SULLIVAN, and their co-conspirators
provided false and misleading financial information to the
investing public and analysts.

25

## Overt Acts

41.   In furtherance of the conspiracy and to effect its illegal objects, BERNARD J. EBBERS, SCOTT D. SULLIVAN and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about October 2000, EBBERS and SULLIVAN discussed WorldCom's deteriorating financial health and poor operating performance, and the improper adjustments required to meet analysts' expectations.

b.   On or about October 26, 2000, EBBERS and SULLIVAN provided false and misleading financial information to securities analysts and the investing public.

c.   On or about November 14, 2000, SULLIVAN signed WorldCom's Quarterly Report on Form 10-Q for the Quarter Ending September 30, 2000.

d.   In or about March 2001, EBBERS and SULLIVAN discussed WorldCom's deteriorating financial health and poor operating performance, and agreed to capitalize line costs solely in an effort to satisfy analysts' expectations for WorldCom's EPS, EBITDA, and net income.

e.   In or about April 2001, with EBBERS's knowledge and approval, SULLIVAN directed members of WorldCom's General Accounting Department to transfer approximately $771

million in line cost expenses to capital accounts in WorldCom's
general ledger.

   f. On or about April 26, 2001, EBBERS and
SULLIVAN provided false and misleading financial information to
securities analysts and the investing public.

   g. On or about June 19, 2001, SULLIVAN left a
voicemail message for EBBERS which stated, in part:

> This MonRev just keeps getting worse and
> worse.  The copy, the latest copy that you
> and I have already has accounting fluff in it
> . . . all one time stuff or junk that's
> already in the numbers.  With the numbers
> being, you know, off as far as they were, I
> didn't think that this stuff was already in
> there.  . . .

   h. In or about July 2001, with EBBERS's knowledge
and approval, SULLIVAN directed members of the General Accounting
Department to transfer approximately $560 million in line cost
expenses to capital accounts in WorldCom's general ledger.

   i. On or about July 10, 2001, EBBERS sent a
memorandum to a senior WorldCom officer requesting information
concerning "those one time events that had to happen in order for
us to have a chance to make our numbers."

   j. In or about October 2001, with EBBERS's
knowledge and approval, SULLIVAN directed members of WorldCom's
General Accounting Department to transfer approximately $743
million in line cost expenses to capital accounts in WorldCom's
general ledger.

27

k.   On or about October 25, 2001, EBBERS and SULLIVAN provided false and misleading financial information to securities analysts and the investing public.

l.   In or about February 2002, with EBBERS's knowledge and approval, SULLIVAN directed members of WorldCom's General Accounting Department to transfer approximately $941 million in line cost expenses to capital accounts in WorldCom's general ledger.

m.   On or about February 7, 2002, EBBERS and SULLIVAN provided false and misleading financial information to securities analysts and the investing public.

n.   On or about March 13, 2002, EBBERS and SULLIVAN signed WorldCom's Annual Report on Form 10-K for the Year Ending December 31, 2001.

o.   On or about March 13, 2002, EBBERS and SULLIVAN caused WorldCom's Annual Report on Form 10-K for the Year Ending December 31, 2001 to be filed with the SEC from New York, New York.

p.   In or about April 2002, with EBBERS's knowledge and approval, SULLIVAN directed members of WorldCom's General Accounting Department to transfer approximately $818 million in line cost expenses to capital accounts in WorldCom's general ledger.

q.   On or about April 25, 2002, EBBERS and
SULLIVAN provided false and misleading financial information to
securities analysts and the investing public.

(Title 18, United States Code, Section 371.)

### COUNT TWO

### (Securities Fraud)

The Grand Jury further charges:

42.   The allegations contained in paragraphs 1 through
35 and paragraphs 40 and 41 of this Indictment are repeated and
realleged as if fully set forth herein.

43.   From in or about September 2000 up to and
including in or about June 2002, in the Southern District of New
York and elsewhere, BERNARD J. EBBERS and SCOTT D. SULLIVAN, the
defendants, unlawfully, willfully and knowingly, directly and
indirectly, by the use of means and instrumentalities of
interstate commerce, and of the mails, and of facilities of
national securities exchanges, in connection with the purchase
and sale of securities, used and employed manipulative and
deceptive devices and contrivances in violation of Title 17, Code
of Federal Regulations, Section 240.10b-5 by (a) employing
devices, schemes and artifices to defraud; (b) making untrue
statements of material fact and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and

29

(c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of WorldCom securities.

>(Title 15, United States Code, Sections 78j(b) and 78ff;
>Title 17, Code of Federal Regulations, Section 240.10b-5;
>Title 18, United States Code, Section 2.)

### COUNT THREE

### (False Filing With The SEC)

The Grand Jury further charges:

44.   The allegations contained in paragraphs 1 through 35 and paragraphs 40 and 41 of this Indictment are repeated and realleged as if fully set forth herein.

45.   On or about November 14, 2000, in the Southern District of New York and elsewhere, BERNARD J. EBBERS and SCOTT D. SULLIVAN, the defendants, unlawfully, willfully, and knowingly, made and caused to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, WorldCom's Quarterly Report on

Form 10-Q for the Quarter Ending September 30, 2000, which
contained false statements as described above.

(Title 15, United States Code, Sections 78m(a) and 78ff;
Title 17, Code of Federal Regulations, Section 240.13a-1;
and Title 18, United States Code, Section 2.)


FOREPERSON                                    DAVID N. KELLEY  MK
                                              United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**BERNARD J. EBBERS and
SCOTT D. SULLIVAN,**

**Defendants.**

## INDICTMENT

S2 02 Cr. 1144 (BSJ)

(Title 18, United States Code, Sections
371 & 2; Title 15, United States Code,
Sections 78j(b), 78m(a), 78ff.)

DAVID N. KELLEY
United States Attorney.

**A TRUE BILL**

*Joanne Y. Johnson*
Foreperson.

Post 11-1-87
3\1\04
Filed Ind.
Ellis jg.