UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

UNITED STATES OF AMERICA

V.

SAMUEL ISRAEL, III,

      Defendant.

—————————————————————— x

U. . . . .
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12|9|19

05 CR 1039 (CM)
REDACTED VERSION

DECISION AND ORDER DENYING MOTION FOR COMPASSIONATE RELEASE

McMahon, C.J.:

      On April 14, 2008, Samuel Israel was sentenced by this Court to 20 years' imprisonment

after pleading guilty to various crimes stemming from the massive investor fraud/"Ponzi"

scheme that he ran for nearly a decade. Shortly thereafter, the Honorable Kenneth M. Karas

sentenced Israel to an additional two years in prison for failing to surrender to serve the sentence

previously imposed by this Court. Israel is currently incarcerated at the Low Security

Correctional Institution in Butner, North Carolina. His projected release date is September 12,

2027. He has served approximately 11 years and 2 months (134 months).

      Before the Court is Israel's motion for compassionate release, filed pursuant to 18 U.S.C.

§ 3582 and the First Step Act. The Government opposes the motion.

      Israel's motion is denied.

### The Compassionate Release Statute

      A court may not modify a term of imprisonment once it has been imposed except

pursuant to statute.

1

Until last December, a court could not modify a defendant's duly-imposed sentence on

compassionate release grounds unless it received a motion from the Bureau of Prisons asking

that the court consider such modification. 18 U.S.C.A. § 1B1.13. Reduction in Term of

Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement) (Effective November 1,

2006; amended effective November 1, 2007; November 1, 2010; November 1, 2016; November

1, 2018).

In December 2018, as part of the First Step Act, Congress worked a change to that rule of

long standing. A court may now consider a motion for compassionate release made by a

defendant who has exhausted his administrative remedies by petitioning the Director of the BoP

to make such a motion, assuming the Director fails to act on the inmate's request within thirty

days:

> [T]he court, . . . upon motion of the defendant after the defendant has fully
> exhausted all administrative rights to appeal a failure of the Bureau of Prisons to
> bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of
> such a request by the warden of the defendant's facility, whichever is earlier, *may
> reduce the term of imprisonment* . . .

18 U.S.C. § 3582(c)(1)(A) (emphasis added).

> The court may modify a sentence on compassionate release grounds only:

> after considering the factors set forth in section 3553(a) to the extent that they are
> applicable, if it finds that . . . extraordinary and compelling reasons warrant such a
> reduction . . . and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission . . . .

> The relevant Sentencing Commission policy statement is found in U.S.S.G. § 1B1.13. It

provides that the Court may reduce the term of imprisonment only if three conditions are met:

(i) extraordinary and compelling reasons warrant the reduction, *id.* § 1B1.13(1)(A);

(ii) the defendant is not a danger to the safety of any other person or to the
community, as provided in 18 U.S.C. § 3142(g), *id.* § 1B1.13(2); and

2

(iii) "the reduction is consistent with this policy statement. *id.* § 1B1.13(3).

The Application Notes describe the circumstances under which "extraordinary and compelling reasons exist." *Id.* § 1B1.13 Application Note 1. One of those is the defendant's medical condition:

(A) Medical Condition of the Defendant.—

. . .

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* § 1B1.13 Application Note 1(A). Israel's motion is predicated on his medical condition, which has deteriorated substantially since he was first incarcerated.

According to a Program Statement issued by the BoP after passage of the First Step Act, a defendant may be considered for a reduced sentence based on a his/her medical condition only if s/he

(i) has an "incurable, progressive illness" or has "suffered a debilitating injury from which [he] will not recover;"

(ii) is "[c]ompletely disabled, meaning the [defendant] cannot carry on any self-care and is being totally confined to a bed or chair'" or

(iii) is "[c]apable of only limited self-care and ... confined to a bed or chair more than 50% of waking hours."

3

U.S. Department of Justice, Federal Bureau of Prisons, Program Statement, OPI OGC/LCI, Number 5050.50, January 17, 2019, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), at 5.

It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. S/he is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.

This is a case in which the defendant's medical situation, debilitated though he be, does not yet reach the level at which BoP Guidelines suggest consideration for compassionate release.

Of greater importance to the Court, this is a case in which the Section 3553(a) factors trump the defendant's medical condition.

I accept as true the evidence, ably presented by Israel's superb lawyer, that the defendant/inmate is severely disabled by incurable and progressive medical conditions, and that his condition has worsened substantially since he was originally incarcerated. Nonetheless, Israel is not entitled to compassionate release. The seriousness of Israel's criminal activity cannot be overstated. For nine years he ran what was (until the revelations about Bernard Madoff) the largest-known Ponzi scheme in history, causing losses of some $450 million to hundreds of victims. This Court cannot and does not find that Israel's medical condition warrants any reduction in his sentence. Indeed, it would make a mockery of the sentencing statute if this

4

financial fraudster, who ruined the lives and finances of hundreds of people while living the high life of an ostensibly successful hedge fund manager, were to be have his sentence reduced.

Background Facts

*The Scheme to Defraud*

Israel, who is now 60 years old, was the Chief Executive Officer of a series of hedge funds collectively referred to as the Bayou Hedge Funds. Between July 1996 and August 2005, he and two co-conspirators, Daniel Marino and James Marquez, defrauded investors into giving them over $450 million (of which $309 million was lost) by inducing them to invest in Bayou. Among the fraudulent acts committed by the co-conspirators were disseminating reports and financial statements that contained materially false statements; creating a phony accounting firm and falsely representing that the firm was auditing Bayou's records regularly; and failing to invest the investors' funds as promised. The reports and financial statements claimed the hedge funds were earning profits through their trading activities, when, in truth, they were always incurring losses.

In addition, about a year before the collapse of the funds, as a way to make back the money that he was losing in his trading operation—and without telling investors what he was doing with their money—Israel tried to invest in so called "high yield trading programs" that promised fantastic rates of return. In reality, these were nothing more than prime bank frauds. (PSR ¶¶ 28-54, 60).

In the Spring of 2005, the scheme began to unravel when state authorities in Arizona, investigating the prime bank frauds scheme, froze over $110,000,000 that Israel had on deposit in a bank account there. A few months later, one of Bayou's largest investors started asking questions about Bayou's phony auditor and sought to redeem his investment. The investor met

with Marino, who gave him a $53,089,300 check that bounced. When the investor returned to the Bayou office, Marino was not there; however, he had left a confession/suicide note that disclosed the fraud in detail. The investor contacted law enforcement.

Marino did not commit suicide[1] and by the next day, Israel and Marino had each retained attorneys. A short while later, they turned over documents and consented to a search of Bayou's offices. (PSR ¶¶ 55-57). The subsequent investigation revealed that approximately 288 investors had lost over $309,000,000 in contributions.

*Israel's Plea and Sentence*

On September 29, 2005, Israel waived indictment and pled guilty to a three count Information charging him with conspiring to commit mail fraud and investment adviser fraud, in violation of 18 U.S.C. § 371; investment adviser fraud, in violation of 15 U.S.C. §§ 80b-6 and 80b-17; and, mail fraud, in violation of 18 U.S.C. § 1341. (PSR ¶¶ 2-4).

On February 19, 2008, prior to his sentencing, the U.S. Probation Office ("Probation") issued a presentence investigation report (the "PSR"). Israel's total offense level was 46 and his criminal history category was I, yielding a Guidelines range of life imprisonment. Israel's statutory maximum sentence was thirty years, so that became the default guideline sentence. (PSR ¶¶ 64-82, 116). The court subsequently adopted Probation's Guidelines calculations.

This Court had every intention of imposing a statutory maximum sentence on Israel, given the extraordinary amount of his theft and the length of time during which he defrauded investors out of their money. However, the Government moved for a downward departure on

---

[1] It is the rare case that features not one but two faked suicides in an effort to escape the reach of the law. Marino's was just the first. Israel's more dramatic attempt to convince authorities that he had committed suicide by jumping off the Bear Mountain Bridge is described below.

6

substantial assistance grounds. Although the Government did not enter into a cooperation agreement with Israel, he ended up proffering extensively, and those proffers proved to be helpful, both in the ensuing investigation and against his co-conspirators:

> His immediate decision to cooperate and to turn over documents in his possession saved the Government time and resources. From the beginning, he has been remorseful and, to the extent we have been able to corroborate his account, we believe he has truthfully recounted his role and the roles of Marino and Marquez in the fraud. His cooperation contributed to the guilty plea of Marino, assisted the Government in connection with Marquez's sentencing []. Israel has also assisted in the ongoing recovery of investor funds and, to that end, was recently deposed by counsel for the Government's receiver in connection with a lawsuit to recover Bayou assets. Moreover, Israel always made himself available to the Government and the Government's receiver, when it was requested, to proffer and answer further questions.

*United States v. Samuel Israel Ill*, 05 Cr.1039 (CM), ECF Document #76 at 18-19.

The Court (with considerable reluctance) granted the Government's downward departure motion and reduced Israel's sentence from the intended 30 years to a term of 20 years' imprisonment, a 33% reduction in the sentence the Court originally intended to impose. Israel was ordered to surrender to a federal prison on June 9, 2008.

Israel failed to report to prison. Instead, he staged a fake suicide by leaving his car in the middle of the Bear Mountain Bridge with the words "Suicide is Painless" written on the windshield. Needless to say, Israel had not jumped to his death; as it turns out, he had sped away on a motorcycle with his then-girlfriend. On July 2, 2008, after an extensive search by law enforcement authorities and the arrest of the girlfriend (who was charged as an aider and abettor), Israel surrendered to officers of the Southwick, Massachusetts Police Department. He was returned this this district, where he pled guilty to an Information charging him with failing to surrender to serve his sentence, in violation of 28 U.S.C. § 3146. On July 15, 2009, The Hon.

Kenneth M. Karas sentenced him to an additional two-year term of imprisonment, to be served consecutively to this Court's sentence. Thus, Israel's total sentence is 22 years' imprisonment.

The Court also ordered Israel to pay $300,000,000 in restitution, half of which remains unpaid. Over two-thirds of the $152,924,382.83 that has been returned to Israel's victims consists of the money that was fortuitously frozen by the State of Arizona. Over $150 million (including interest) disappeared into bad investments or the pockets of Israel and his co-conspirators.

*Israel's Health at the Time of Sentencing*

[REDACTED]

Israel moved for a downward departure in his sentence on the basis of "extraordinary physical impairment." The Government, having already submitted a 5K1.1 motion on Israel's behalf, opposed this motion, arguing, among other things, that his ailments were of long standing, occurring throughout the period while he was perpetrating the fraud, during which period he was leading a relatively normal life. The Government also argued, relying on a letter from the BOP, that the BOP was capable of caring for Israel.

The Court, having granted the Government's downward departure motion, denied Israel's downward departure motion based on his health, "as a matter of my discretion." I noted that the

Bureau of Prisons had stated that it could care for Israel and said that if (and only if) the time came when BoP could no longer discharge that obligation, the Director was able to contact me and move for a reduction in sentence (under the old rules then in force). (Sentencing Tr. at 64)

Israel took an appeal from his sentence, arguing that this Court erred by not granting a downward departure based on his medical needs. The Court of Appeals ruled the claim "meritless." He also argued that he should have received more credit for his cooperation. The Circuit rejected that claim as well finding "the District Court's significant reduction was well within its discretion."[2]

Finally, Israel implored the appellate court to reduce his sentence because its sheer length rendered it unreasonable. The Circuit concluded that, "given the long history of Defendant's criminal conduct and the massive amount of money involved in this case, a twenty-year sentence was within the range of permissible decisions." *United States v. Israel*, 331 F. App'x 864, 866 (2d Cir. 2009) (Summary Order).

### *Post-Sentencing Motions*

In May 2014, Israel filed a motion to reduce his sentence in the fraud case to time served, pursuant to 28 U.S.C. §2255, on the ground that the BOP was no longer capable of addressing his medical conditions. He claimed that the BOP consistently refused to offer him proper medical treatment, which had exacerbated his medical problems, culminating in a near-death experience in 2013. Israel insisted that the Court selected its sentence "in large part" based upon "the assurances by the Federal Bureau of Prisons that it could in fact adequately treat the medical

---

[2] Israel had consistently argued that he was not the mastermind behind Bayou and that he was less culpable than his co-conspirators– an argument that, as the Government pointed out at the time of sentencing and on appeal, was not supported by the scintilla of evidence. In the end, because of the Government's motion, Israel's sentence was no greater than that of Marino, who participated in the conspiracy for an equivalent period of time.

11

conditions of the Petitioner." He argued that the BOP's inability to provide him with adequate

treatment or effective pain management had negated the Court's "rationale" in imposing his

sentence.

On August 7, 2014, the Court issued an order denying Israel's petition as untimely, and

otherwise procedurally barred: "Israel's claim—'the BOP can no longer treat my medical needs'—

is not a justiciable basis for a motion brought pursuant to § 2255." *United States v. Samuel Israel*

*III*, 05 Cr.1039 (CM), ECF Document #198.

Having dismissed Israel's petition on procedural grounds, the Court disabused Israel of the

notion that BoP's ability to care for him was not my "rationale" for sentencing him to a 20-year

term of incarceration:

> A word about the Court's subjective intent in formulating defendant's sentence:
> The driving consideration for the Court in sentencing defendant to 20 years in
> prison was that he was the mastermind behind a $450 million Ponzi scheme.[3]  I
> may have taken Mr. Israel's medical needs into account when I gave him as little
> as 240 months;[4] I assuredly would never have given him less, regardless of my
> perception of the quality of the BOP medical care.

*Id*. at 4, n.3.

Israel is presently incarcerated at the Low Security Correctional Institution in Butner,

North Carolina. His projected release date is September 12, 2027. He has served approximately

11 years and 2 months (134 months), or about half, of his 22-year sentence.

---

[3] The reference to $450 million comes from the PSR, which identified that as the amount of money paid
into Bayou by its victims. The statement would have been no different if the court had relied instead on the
loss amount, which, as noted above, is $309 million.

[4] This is a reference to the statement at page 64 of the Sentencing Transcript, which is referenced on page
10 of this decision; as mentioned, the court denied Israel's motion for a further downward departure on
medical grounds.

Israel's Motion for Compassionate Release

Israel has made two requests for compassionate release in the last year.

*Israel's First Request to the BOP for Compassionate Release*

Israel's first request was made on May 21, 2018, prior to the passage of the First Step Act. Israel asked the Director of the BOP to recommend that the Court reduce his sentence on compassionate release grounds based on his debilitated medical condition -- specifically, █████

████████████████████████████████████████████████████████

██████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████



[5] ████████████████████████

[6] On both scales, a lower score indicates a higher level of dependence, so 1 out of 6 or 7 would be the lowest score and 7 out of 7 the highest score.

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████

On September 26, 2018, after consulting with the BOP's Medical Director, the Office of General Counsel denied Israel's request that BoP make a compassionate release motion on his behalf.

According to the memorandum denying the request, compassionate release/reduction in sentence (RIS), pursuant to 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), section 3(b) ("Debilitated Medical Condition") provides that "RIS consideration may be given to an inmate suffering from a debilitated medical condition if the inmate is (1) completely disabled, meaning the inmate cannot carry on any self-care and is totally confined to a bed or chair; or (2) capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours."

The memorandum recounted that Israel had a history of ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

15

████████████████████████████████ But, it reported that he "is able to independently perform his activities of daily living (ADLs) with the assistance of adaptive devices." Thus, "because Mr. Israel independently performs his ADLs, he does not meet the criteria for a RIS under section 3(b)."

*Israel's Second Request to the BOP for Compassionate Release*

On February 24, 2019, after passage of the First Step Act, Israel submitted a second request for compassionate release, again based on his medical condition, to the Director of the BoP. This time he described his condition as "debilitated" and "possibly terminal." Rather than further describe his medical status, he authorized the release of his medical records. (See Govt Exh. 4).

████████████████████████████████████████

███████████████████████████████

█████████████████████████████████

█████████████████████████████████

███████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

███████████

████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

On April 9, 2019, the Institution's Warden delivered a memorandum to the BOP Office of General Counsel "recommending consideration to be given to a request or a reduction in sentence for inmate Samuel Israel based on his debilitative medical condition." Again, the memo recounted that the request "was precipitated by medical information unavailable at the time of sentencing." ████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████

The Director of BoP did not act on Israel's request within the statutory thirty-day period. As a result, Israel filed a compassionate release motion with this Court on May 18, 2019, pursuant to 18 U.S.C. § 3582 and the First Step Act.

However, on July 18, 2019—two months after Israel filed this motion—the Office of General Counsel, after consulting with BoP's Medical Director, belatedly denied Israel's second request to have BoP seek a reduction in his sentence, again on the ground that Israel did not meet the criteria for a RIS under section 3(b). (Govt Memo at Exh. 7). According to the denial memorandum:

Israel has a ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ Mr. Israel requires some assistance with his Activities of Daily Living (ADLs), and Instrumental Activities of Daily Living (IADLs) such as setup for feeding, grooming, dressing, laundry, housekeeping, transportation outside of the institution, and meal preparation. Mr. Israel is independent with using the phone, computer, and TRULINCS, and with bathing himself. Mr. Israel resides in general population and is assigned an inmate companion who assists him when needed.

The Office of General Counsel found that Israel did not meet the criteria for a RIS under

section 3(b) because, "[a]lthough he needs some assistance from an inmate companion, he is still

capable of independently performing and/or assisting with his ADL and IADL needs."

### Israel's Motion for Compassionate Release in the District Court

*Israel's Argument*

Israel argues that his medical condition presents the necessary extraordinary and

compelling reason to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A). In support of his

argument that he has debilitating medical conditions, he avers as follows:





19

Israel argues that consideration of the factors set forth in 18 U.S.C. §3553(a), particularly the "history and characteristics of the defendant" and "the need for the sentence imposed to provide the defendant with ...medical care...in the most effective manner," support his release. (Mot 16). Specifically, citing 18 U.S.C. §3553(a)(2)(D), he argues that his medical condition has changed substantially since his remand in that when he entered prison, ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Israel argues that, while the BOP will likely assert that it can provide adequate medical care for Israel, the record reflects that it has not done so, and that his long and persistent deterioration "tells a different narrative." (Mot. 16). He claims that Dr. Rosenthal recommended that his sentence be reduced, and BOP failed to consider her recommendation. (Mot 16-17).[7]

Israel also argues that he provided a release plan pursuant to which he could receive necessary care in the most effective manner. Citing *United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006), Israel argues that even if the Court were to find the BOP had the ability to care for Israel, under §3553(a)(2)(D), the Court could still determine that his conditions would be treated "'in the most effective manner' outside the prison environment, with private medical care." (Mot. 17).

---

[7] Dr. Rosenthal completed a form indicating Israel was medically eligible for consideration of compassionate release. This is not an opinion as to whether his sentence should be reduced.

Israel argues, generally, that the BOP suffers from general and medical staffing shortages, delays in treatment and problems in recruiting medical personnel. (Mot. 17). Using this information, his own chronology of events and an affidavit from his own private doctor, Dr. Eison, he argues that delays in his obtaining outside consultations and treatment may be attributable to these factors. (Mot. 17-18). Dr. Eison's affidavit describes Israel's need for assistance in his daily activities and professional monitoring ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Finally, Israel argues that a sentence of time served or probation would not "disserve" the factors set out in 18 U.S.C. §3553(a)(2)(A)-(a)(2)(C) because: (1) he has served just over half of his sentence; (2) as he gets older, each year is harder and more costly; (3) the reduction will not minimize the seriousness of his offense and will provide just punishment and adequate general deterrence; (4) even a reduced sentence will provide adequate protection of the public from further crimes in that Israel will not be in a position to manage anyone's finances, he has no history of violence; and he would still be on supervision, either through supervised release or probation/home confinement; and (5) the Sentencing Commission advises that age and illness may be reasons for departing or varying below the recommended Guidelines range. (Mot 19).

In sum, Israel argues that the Court should grant his motion because he is suffering from a "myriad of life-threatening medical conditions" and the BOP "has failed to appropriately care

21

for him." Further, "[r]egardless of what the BOP can, or will, do to help him, the 'most effective manner of treating [him] is for his release to the care of his family so that they may provide him with private medical care. He has a loving and supportive family willing and able to make sure that, once he is released, the appropriate treatment, provided by Tulane University Hospital will be implemented." (Mot. 22-23).

### *The Government's Response to Israel's Motion*

The Government opposes Israel's motion. While the Government does not contest that Israel's medical records, including the comprehensive medical summaries prepared by Israel's BOP treating physicians, may establish that he has debilitating medical conditions as defined in U.S.S.G. § 1B1.13, or that his ability to provide self-care within the environment of a correctional facility appears to be diminishing, it points out that these same records also demonstrate that he can perform some activities of daily living himself and others with the assistance of an aid. The Government's position is informed in some respects by the belated response of the BoP to Israel's second request for compassionate release.

The thrust of the Government's argument, however, is that, even if the Court were to find that Israel's medical conditions meet the criteria of debilitating medical conditions, the Court should deny Israel's motion because "a reduction in his sentence, particularly to time served [which would effectively cut his sentence in half], would not reflect the seriousness of his crimes, provide just punishment, promote respect for the law, and afford general deterrence." (Govt. Response at 12).

22

*Public Response to Israel's Motion*

Although much of the record is sealed because it consists of personal medical

information, the fact that Israel has made this motion is a matter of public record. And while I

doubt that many of his victims are aware of its pendency, the Court has received one letter from

an Israel victim opposing compassionate release. Lest there be any doubt that victims of Israel's

fraud are still suffering, I share the following:

> In 2004, my husband and I sold our home and invested all of the monies from that
> sale into the Bayou Fund. . . . When we first heard the news of Sam Israel's fraud
> on CBS radio, our pain, shock, and dismay we suffered was beyond comprehension.
> . . . The financial debacle occurred when my husband was 78 years old. . . . I had
> to go back to work. At age 66, it was not easy to find employment. Eventually I
> worked as a full-time substitute teacher in a local school system. Each morning I
> awakened at 5:30 and at 7AM I was in school. At a time when we should have been
> together, enjoying our 'golden years', we spent our days apart and shed many tears
> over this shattering event . . . I urge you to deny [Israel's] request for compassionate
> release because this man deserves the same level of compassion he showed his
> investors. Mr. Israel is and example of someone whose life was built on lies and
> should complete the full term of his sentence.

Investor-Victim Letter (Docket # 211).

## Israel's Motion is Denied

I have no doubt whatever that Israel—who has the burden of showing that "extraordinary

and compelling reasons" to reduce his sentence exist[8]--has established that he suffers from

severe, debilitating, progressive and permanent medical conditions. While he can at present live

and function in the general prison population, he requires substantial and increasing amounts of

assistance to do so. He does not qualify as "completely disabled" under BoP regulations, but he

is certainly not a well person.

---

[8] *See, e.g., United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal
and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf.
United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013)

23

I also agree that Israel is unlikely to recidivate at this point—who would invest with him?—and so poses little danger if he were to be released.

But that is not the end of the inquiry.

In the opinion of this Court, cutting Samuel Israel's sentence in half—which is what he requests—would undermine the goals of sentencing set forth at 18 U.S.C. § 3582(c)(1)(A) and § 3553(a). In particular, reducing Israel's sentence would not reflect the seriousness of his crimes, provide just punishment, or promote respect for the law.

Israel's crimes were extremely serious. For nine years between 1996 and 2005, he and his co-conspirators perpetrated an extensive, complex fraud. Israel was the mastermind behind Bayou; and from 2001 (when he forced his partner, Marquez, out of the scheme) until the fraud unraveled in 2005, Israel was the sole trader at Bayou, the public face of Bayou, and the key person who had contact with investors and potential investors. It was Israel who communicated with individual and institutional investors and persuaded them, using false numbers showing the hedge funds were earning profits, to have confidence in his trading strategies and invest their money and their clients' money in the Bayou hedge funds. It was Israel who created the trading strategies that lost most of the investors' money. And through it all, even though Israel knew he was operating a Ponzi scheme and losing hundreds of millions of dollars in investors' funds, he drew millions of dollars in compensation, lived the life of a successful hedge fund manager, and reaped the benefits of having the reputation of a successful hedge fund manager.

The duration and scope of the scheme that enriched Israel at the expense of hundreds of innocent people fully justify his spending two decades in prison. The amount of money he stole was (and remains, to this court) unthinkably massive. It is true that, less than a year after he was sentenced, the even larger Ponzi scheme run by Bernard Madoff finally unraveled, and the

24

amount of money and number of victims of the Madoff scam dwarfs Israel's Bayou operation. But Madoff—the only BoP prisoner known to this Court to whom Israel can logically be compared, given the similarity of their criminal conduct (right down to the fake account statements) and the vast amounts of money they stole/lost—is serving a sentence of 150 years (life) for causing an estimated loss amount of $13 billion.[9] Having Israel spend 20 years in prison for stealing hundreds of millions of dollars from hundreds of victims is anything but disproportionate.[10]

But just punishment given the nature and circumstances of the offense is not the only Section 3553(a) factor that counsels against reducing Israel's sentence. Promoting respect for the law is also an important factor in this Court's thinking.

Our prisons are heavily populated with individuals who do not look like Samuel Israel. They did not come from prominent and wealthy families, grow up in privileged communities, attend prestigious prep schools and colleges, and live in luxury in Westchester, New York. They come from inner-city poverty and have little education or job training. Many of them have committed serious crimes as a way of "getting by" in a world in which they have been dealt a bad hand; often joining gangs in search of the structure that those lacking an intact family often crave. This does not lessen their criminality; but it explains why they do what they do in a way that Israel's criminality cannot be explained. Moreover, these young men, most of them members

---

[9] While estimates of the total breath of the Madoff fraud vary greatly, at Madoff's sentencing, prosecutors conservatively estimated the loss at $13 billion, more than 32 times the maximum loss threshold ($400 million) in Guidelines § 2B1.1(b). *United States v. Bernard Madoff*, 1:09-cr-00213-DC, Government Sentencing Letter at 21, Document 92, Filed 06/26/09. He was sentenced on that basis. Indeed the loss attributed to both men exceeded the top end of the Fraud Guidelines Table.

[10] The individuals cited in the Reply Brief filed on Israel's behalf are not proper comparators to Israel—he really has only one, and that is Madoff—and the Court is not persuaded that a failure to reduce his sentence would violate the goal of proportionality.

25

of minority groups, are far more likely to commit crimes, be caught and incarcerated for periods of 10 or 20 years or even longer during the prime of their lives—the very years when Israel was perpetrating his fraud—or even younger.

These defendants and their families and communities have for years argued that white-collar criminals are hardly ever prosecuted, and that the few who are—no matter the damage they do—tend to receive lighter sentences and are incarcerated in less onerous conditions. They are not wrong. Privileged individuals who commit financial crimes from behind the walls of ostensibly legitimate financial institutions frequently go undetected and unprosecuted. The few who are prosecuted can hire the finest defense attorneys in the world to represent them. And those who are convicted are often designated to lower-security prisons, which—while admittedly still unpleasant places—are far less so than the facilities at which young men from minority communities typically serve their time. Adjusting Israel's sentence downward on "compassionate" grounds, despite the seriousness of his crime and the amount of his fraud, while leaving these other defendants where they find themselves, does nothing to promote respect for the law. It simply reinforces the belief that there is one law for the white-collar criminal and another law altogether for the ghetto dweller or the drug dealer

Israel argues that the time he has already served in prison is enough to accomplish the goals of § 3553(a), because the years have been more difficult than was originally anticipated at his sentencing and more laborious than sentences served by other inmates. (Mot. 19). Given the nature and circumstances of his crime, I am constrained to disagree. Israel was not designated to a maximum-security facility – which is where persons who are serving sentences of two decades and more customarily find themselves. His increasing health problems have no doubt made his stay at FCI Butner (a facility recommended by this Court, and chosen, I assume, by BoP

26

specifically because of its focus on health-challenged inmates) more difficult. But that does not mean he has endured a period of incarceration more difficult than most who are sentenced for crimes of this magnitude.

The Government argues that reducing Israel's sentence would also undermine the goal of general deterrence, which it views as especially important in white collar cases. While this Court has on occasion expressed the view that general deterrence does not rank as high in my sentencing priorities as do other 3553(a) factors, the Government's argument is not, in this particular instance, wrong– again, given the magnitude of Israel's crime and the hundreds of millions of dollars in losses that he caused. If someone can obtain almost a half a billion dollars under false pretenses,[11] leave his victims bereft of over $300 million, and get out of prison after just 11 years, any impact that the sentence might have on others who might be inclined to commit crimes would likely be ameliorated.

The defense argues that § 3553(a)(2)(D) supports a reduction in his sentence "to provide the defendant with needed …. medical care….in the most effective manner." He also argues that being at home with his family will be a more efficient and effective way for him to obtain treatment for his various conditions. (Mot. 17-19).

I take it as a matter of settled fact that the Bureau of Prisons is not the best place for anyone to receive medical care. I said as much at Mr. Israel's sentencing (*See* Israel Sentencing Transcript at 62), and I have made that observation numerous times over the years when sentencing defendants.

---

[11] Probation and the Government estimated that Israel obtained in excess of $450 million from his victims over the nine years course of the fraud. *See* PSR at 19.

27

But in view of the magnitude of Israel's crimes, and the relative leniency of his sentence given the amount of money he obtained by false pretenses, this particular factor does not weigh heavily in my thinking. Israel has not demonstrated that BoP cannot give him adequate medical care▬

▬ There is no expert support for his speculative assertion that his condition would be better if only BoP had taken better care of him over the last eleven years. Israel's desire for the emotional support and comfort of being at home with his family is understandable, but every prisoner shares that same understandable desire. It is simply not a sufficient basis for reducing his sentence.

I end where I began. A court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition (as Israel, I note, does not). The First Step Act was drafted using the word "may," not "must." In the end, whether to reduce a sentence is a matter that rests in the discretion of the sentencing court.

As a matter of my discretion, I do not believe that Samuel Israel's sentence should be reduced, notwithstanding his compromised medical condition or the undoubted fact that he could receive better medical care in the private sector. I repeat what I said at Israel's sentencing: If the moment comes when he becomes so debilitated that the Bureau of Prisons cannot care for him, I expect the Director to let me know. Until then, in prison he stays.

The motion for compassionate release is denied.

28

This constitutes the decision and order of the Court.

December 4, 2019

Colleen McMahon
Chief Judge

BY ECF TO ALL COUNSEL

29