USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___1/8/2020___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNITED STATES OF AMERICA,                    :
                                             :
        -against-                            :
                                             :        (S4) 02-CR-1144-3 (VEC)
BERNARD J. EBBERS,                           :
                                             :        OPINION
                              Defendant.     :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        In 2005, Defendant Bernard ("Bernie") Ebbers, the former CEO of WorldCom, Inc., was

sentenced to 25 years of imprisonment after a jury convicted him of securities fraud. As a result

of his crimes, investors and shareholders lost hundreds of millions, perhaps billions, of dollars,

and thousands of WorldCom employees lost their jobs and savings. Ebbers has now been

incarcerated for more than 13 years. He is 78 years old with significant health issues.

        On September 5, 2019, Ebbers moved for compassionate release under 18 U.S.C. §

3582(c)(1)(A), as amended by the First Step Act of 2018 (hereinafter "First Step Act"), Pub. L.

No. 115-391, 132 Stat. 5194. *See* Dkt. 350. This provision empowers a court to reduce a

defendant's term of imprisonment if it finds that "extraordinary and compelling reasons warrant

such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Until passage of the First Step Act, only the

Bureau of Prisons ("BOP") could bring a motion for compassionate release. The First Step Act

created an independent avenue for defendants to seek relief from the federal courts.

        Before ruling on Ebbers's motion, this Court ordered the Government to provide the

victims of Ebbers's crime with notice of these proceedings so that they could be heard. *See* Dkt.

365. Then on December 18, 2019, the Court granted Ebbers's motion after oral argument from the parties. *See* Dkt. 379.[1] This Opinion sets out the Court's reasoning for each decision in turn.

## BACKGROUND

In September 2004, a grand jury charged Ebbers with nine counts of securities fraud and conspiracy to deceive the investing public and the SEC concerning WorldCom's true operating performance and financial results. After a seven-week trial, in March 2005, a jury returned guilty verdicts on all counts. The jury found that Ebbers had directed WorldCom to manipulate and publicly report inflated financial results, hiding WorldCom's true financial condition in order to meet securities analysts' expectations.

When Ebbers and his co-conspirators' fraud came to light in June 2002, WorldCom's stock price dropped more than 90%—a loss of more than $2 billion in market capitalization. Numerous shareholders and former employees lost their savings, medical benefits, retirement funds, and jobs. Today, many who suffered losses as a result of the WorldCom fraud continue to struggle from its effects. The Court has received numerous letters from victims reckoning with homelessness, debt, property loss, and unattended medical needs. Victims have undertaken substantial efforts to find new employment and to work long hours at multiple jobs with the hope of recovering a semblance of financial stability. Some victims urged this Court to keep Ebbers in prison until he dies; others pleaded for compassion for him and his family.

---

[1] This Opinion includes details of Ebbers's medical tests, results, and diagnoses. The vast majority of these details are in the public record, summarized in the motion papers and subsequent letters on the docket from Ebbers's counsel and the Government. *See* Dkts. 350, 354–55, 358–59, 361, 367–68, 370, 372–73. The medical records themselves remain under seal, but the Court draws a limited number of details from them for the purposes of this Opinion. The Court has determined that the presumption of access to the courts overcomes Ebbers's privacy interest, which he has largely waived in any event by extensively citing to his medical records and medical history in his own motion, in correspondence with the Court, and in open Court during oral argument on his motion. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 123 (2d Cir. 2006); *United States v. King*, 2012 WL 2196674, at *2 (S.D.N.Y. June 15, 2012) (declining to seal medical records because the defendant asked the court "to consider [her medical records] in arriving at the sentence in [her] case").

At Ebbers's sentencing (which post-dated *United States v. Booker*, 543 U.S. 220 (2005)), the court determined the relevant Sentencing Guidelines range, considered it and the sentencing factors contained in 18 U.S.C. § 3553, heard from victims, and considered Ebbers's age and health. As to the Guidelines calculation, now-retired Judge Barbara Jones[2] found that the loss amount calculated by the Probation Department—over $2 billion—was "a reasonable estimate," and applied a 26-level enhancement because the loss exceeded $100 million. The court further applied an enhancement for Ebbers's leadership role in the fraud. All considered, Ebbers's felonies yielded a Guidelines range of 30 years to life imprisonment. Judge Jones considered Ebbers's age, heart condition, and charitable works, but denied his request for a medical condition downward departure. Judge Jones noted "that this sentence is likely to be a life sentence for Mr. Ebbers, [but] a sentence of anything less would not sufficiently reflect the seriousness of this crime." She imposed a term of imprisonment of 25 years. Ebbers remained free on appeal, ultimately surrendering to the BOP to begin his sentence on September 26, 2006. His projected release date was July 4, 2028.

In July 2016, Ebbers petitioned the BOP for compassionate release, citing his macular degeneration and cardiomyopathy. At that time, a doctor evaluating Ebbers's condition noted that Ebbers "has no difficulty navigating around his housing unit or throughout the institution. He holds a job as an orderly in the unit, and has no problems doing that job." Although his macular degeneration was progressive and incurable, the doctor noted that blind inmates are able to function in prison, and the prison would be able to accommodate him as his eyesight worsened. The doctor also concluded that Ebbers's cardiomyopathy was stable and manageable.

---

[2] Judge Jones retired in 2013. When Ebbers filed his First Step Act petition, the case was randomly assigned to the undersigned.

The BOP denied the petition in August 2019, determining that Ebbers did not qualify under BOP guidelines for compassionate release.  The accompanying memorandum noted that Ebbers is "closely followed by cardiology and ophthalmology, and . . . his medical conditions are chronic but stable at this time."  The BOP recognized that Ebbers is "legally blind," but noted that Ebbers could bath, dress, groom, move around the prison, and go to the bathroom himself.  At the time, he also worked as an "orderly and has acknowledged he is not having any difficulties performing his duties."

Having exhausted his remedies with the BOP, Ebbers filed the instant motion with the Court for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A).  Ebbers, then incarcerated at the Federal Medical Center in Fort Worth, Texas ("FMC Fort Worth"), listed five conditions warranting early release: (1) macular degeneration; (2) cardiomyopathy; (3) diabetes; (4) inguinal hernia; and (5) significant weight loss and physical and mental deterioration.  Ebbers also relied on a letter from Judge Jones, who has since retired from the bench, supporting his petition: according to Judge Jones, "given [Ebbers's] serious health problems, [Ebbers] has been punished enough."[3]

## DISCUSSION

I. **Victim Notification**

The Court first finds that the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, Title I of the Justice for All Act of 2004, Pub. L. No. 108-405, 118 Stat. 2260, does not require victim notification of compassionate release proceedings unless the proceedings will include a public hearing in open court.  But in light of courts' discretion in sentencing and the broad rights-

---

[3]  It is not clear what medical records retired-Judge Jones reviewed before making her recommendation.

based language of the CVRA, a court may order notice to victims regardless of whether there are plans to hold such a hearing.

In determining whether notice was mandatory, the Court first considered the plain meaning of the statute. *See United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (instructing courts to consider "the specific context in which the language is used, and the broader context of the statute as a whole," not just "dictionary definitions" (quotations omitted)). Section 3771(a)(2) grants crime victims the "right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused." 18 U.S.C. § 3771(a)(2). The two prepositional phrases in the provision address different rights to notice. A victim has the "right to reasonable, accurate, and timely notice [1] of any public court proceeding . . . involving the crime or [2] of any release or escape of the accused." *Id.* Thus, whether the CVRA requires notice depends upon whether a motion for compassionate release is a "public court proceeding . . . involving the crime." *Id.*

The text shows that the term "public court proceeding" refers to a hearing in open court. Section 3771(a)(3) grants a "right not to be *excluded* from any such public court proceeding." *Id.* § 3771(a)(3) (emphasis added). The word "excluded" plainly implies exclusion from being physically present. *See also Exclude*, Oxford English Dictionary (3d ed.) ("To shut out (persons, living things), hinder from entering (a place, enclosure, society, etc.)."). That, in turn, suggests that Congress used the term "public court proceeding" to mean an event in court that a victim could attend in-person. This interpretation is consistent with the interpretation that has been given to the same phrase in 18 U.S.C. § 3771(a)(2)—it "ensures a victim can reasonably arrange her affairs to *attend the proceeding* for which notice is given." *United States v. Turner*, 367 F. Supp. 2d 319, 332 (E.D.N.Y. 2005) (emphasis added). And when a single term, like "public

court proceeding," appears in different provisions of the same statute, the Court presumes it has the same meaning in both places. *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007).

The Court's analysis did not end there. The statute also gives victims a "right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." 18 U.S.C. § 3771(a)(4). The prepositions "at" and "in" imply that the right applies to proceedings in open court at which a victim could attend and could be heard. In accord, the Ninth Circuit has construed "public proceeding" in section 3771(a)(4) to be synonymous with a live court proceeding. *See United States v. Burkholder*, 590 F.3d 1071, 1075 (9th Cir. 2010); *Kenna v. U.S. Dist. Court for Cent. Dist. Cal.*, 435 F.3d 1011, 1014–15 (9th Cir. 2006). The Ninth Circuit noted that "[v]irtually all proceedings in district court are public in the sense that the papers and other materials may be viewed by anyone on request to the clerk's office. When Congress used the word 'public' in this portion of the CVRA, however, it most likely meant to refer to proceedings in open court—much as the word is used in the common phrase 'public hearing.'" *Kenna*, 435 F.3d at 1015. This interpretation is consistent with the legislative history of the CVRA, which indicates that "the very purpose of this section is to allow the victim to appear personally and directly address the court," noting that "[t]he right to make an oral statement is conditioned on the victim's presence in the courtroom." *Id.* at 1015–16 (quoting 150 Cong. Rec. S10911 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl) and S. Rep. No. 108-191, at 38 (2003)). Congress thus gave victims the right to speak at a "public proceeding" in court, but Congress did not create any separate right to be heard when a decision

on a motion for compassionate release is made based only on written presentations of the parties.[4]

This Court, aware that Ebbers's motion might be decided on the motion papers, nonetheless ordered notification to victims before a decision was made whether to hold a public hearing. It did so for two reasons. First, "[s]entencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence." *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see United States v. Eberhard*, 525 F.3d 175, 177 (2d Cir. 2008) ("[T]he sentencing court's discretion is largely unlimited either as to the kind of information it may consider, or the source from which it may come." (quotations omitted)). Second, the broad rights-based language of the CVRA counsels in favor of giving victims notice and an opportunity to be heard, regardless of whether there will be a hearing in open court. "Most of the rights conferred by the Act are aimed at ensuring that victims have dignity and 'voice' in criminal proceedings, and do not provide specific procedures for their implementation." *Fed. Ins. Co. v. United States*, 882 F.3d 348, 358 (2d Cir. 2018). Congress enacted the CVRA in order "to protect victims and guarantee them some involvement in the criminal justice process." *United States v. Moussaoui*, 483 F.3d 220, 234 (4th Cir. 2007). That involvement extends beyond pre-trial proceedings. *See Brandt v. Gooding*, 636 F.3d 124, 136–37 (4th Cir. 2011) (determining that a habeas petition was sufficient to constitute a public proceeding within the Act and triggered a victim's right to be heard). And it extends beyond victims telling their stories in open court. Courts frequently consider written impact statements, as "[a] victim can achieve [the aims of the CVRA] by submitting a written impact statement

---

[4]     Because the Court sees no meaningful difference between the terms "public proceeding" in section 3771(a)(4) and "public court proceeding," this conclusion also reinforces the Court's interpretation of the latter.

describing the effects of a defendant's crime." *Burkholder*, 590 F.3d at 1075. For the same reason that it is appropriate to hear from victims who wish to be heard before a judge initially imposes sentence, it is equally appropriate to give victims an opportunity to be heard again before the sentence that was initially imposed is modified.[5]

For those reasons, the Court found it appropriate to order the Government to give Ebbers's victims notice of his motion for compassionate release and to give the victims an opportunity to be heard.

## II.      Compassionate Release

Under federal law, a defendant is permitted to make a motion to reduce his or her sentence after exhausting "all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." 18 U.S.C. § 3582(c)(1)(A). A court may then "reduce the term of imprisonment" after finding that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A)(i). In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable." *Id.* § 3582(c)(1)(A). The defendant has the burden to show he is entitled to a sentence reduction. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

---

[5]      This case is evidence that the strong feelings of victims do not necessarily fade away with the passage of time. The Court received over 500 letters or emails from victims expressing their views on Ebbers's request for compassionate release. Their views on his motion for release were important information for the Court to have when determining whether Ebbers's request should be granted. In crimes of violence it could be even more important to hear from victims in advance of deciding such motions, regardless of whether there will be a public proceeding of which they have a statutory right to be notified.

### A. Legal Principles

#### 1. Extraordinary and Compelling Reasons and the Sentencing Commission's Applicable Policy Statements

Congress has delegated authority to the Sentencing Commission ("USSC") to "describe what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(t). The USSC's applicable policy statement is U.S.S.G. § 1B1.13; but this statement is at least partly anachronistic because it has not yet been updated to reflect the new procedural innovations of the First Step Act. For example, it refers in its opening line to a "motion of the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13.

U.S.S.G. § 1B1.13 is, nonetheless, helpful in defining a vague standard. The First Step Act did not revise the substantive criteria for compassionate release. Although the history and text of the First Step Act suggest that Congress intended to broaden the availability of compassionate release (its title is "Increasing the Use and Transparency of Compassionate Release"), Congress in fact only expanded access to the courts; it did not change the standard. *See United States v. Brown*, 2019 WL 4942051, at *3 (S.D. Iowa Oct. 8, 2019) (noting that the title is "especially valuable" in evaluating Congress's intent in light of the BOP's long and criticized history of rarely granting compassionate release petitions); *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019) ("Aside from allowing prisoners to bring a motion directly, the First Step Act did not change the standards for compassionate release."). Congress did not revise the statute's substantive text or alter the USSC's authority to define "extraordinary and compelling reasons." And there is no indication in the text or the USSC's policy statements that the identity of the movant should affect the meaning of the phrase "extraordinary and compelling reasons." Thus, U.S.S.G. § 1B1.13's descriptions of "extraordinary and compelling

reasons" remain current, even if references to the identity of the moving party are not.[6] *Accord United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (collecting cases).

Application Note 1 to U.S.S.G. § 1B1.13 sets forth four circumstances that constitute "extraordinary and compelling reasons."  Of those, only the first two were germane to this Court's decision.  Note 1(A), Medical Condition of the Defendant, states that "extraordinary and compelling reasons" exist when "the defendant is suffering from (i) a terminal illness," or "(ii) . . . is (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process," that also "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" (hereafter "Medical Condition Note").  Note 1(B), Age of the Defendant, states that "extraordinary and compelling reasons" exist when "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less" (hereafter "Age of Defendant Note").

Whether a defendant is experiencing "a serious deterioration in physical or mental health because of the aging process," a criterion that is part of the Age of Defendant Note, is a fact-

---

[6]      On the other hand, because no statute directs the Court to consult the BOP's rules or guidelines, *see* 28 C.F.R. pt. 571, subpt. G, and no statute delegates authority to the BOP to define the statutory requirements for compassionate release, the Court finds the BOP Guidelines to be inapposite.  *Accord United States v. Cantu*, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (holding that the BOP does not determine the meaning of "extraordinary and compelling reasons").  Indeed, the BOP's rules conflict with the USSC's.  The BOP limits "extraordinary or compelling circumstances" to those "which could not reasonably have been foreseen by the court at the time of sentencing," 28 C.F.R. § 571.60, but the USSC has stated the opposite, *see* Application Note 2, U.S.S.G. § 1B1.13.  Moreover, the First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts.  Deferring to the BOP would seem to frustrate that purpose.  *See United States v. Beck*, 2019 WL 2716505, at *12 (M.D.N.C. June 28, 2019) ("[T]he terms of the First Step Act give courts independent authority to grant motions for compassionate release and says nothing about deference to BOP, thus establishing that Congress wants courts to take a *de novo* look at compassionate release motions.").

intensive analysis; but comparing the two notes reveals that a defendant need not have lost all ability to provide self-care or be suffering from a terminal illness to qualify for relief under the Age of Defendant Note. The medical condition phrase in the Age of Defendant Note is almost identical to a similar phrase in the Medical Condition Note, except that the Medical Condition Note includes the additional requirement that the defendant's deteriorating health must "substantially diminish[] the ability of the defendant to provide self-care." Because the Age of Defendant Note does not mention self-care, a substantially diminished ability to provide self-care is impliedly not required when the defendant is relying on his age as the basis for his requested relief. A defendant's ability to provide self-care in prison is, nevertheless, one factor a court may consider, just not a required factor.[7] The Medical Condition Note, which controls health-based compassionate release requests for younger defendants, highlights "terminal illness" and "serious [conditions and impairments]," including "advanced dementia" and other diseases associated with an "end of life trajectory."[8] The Age of Defendant Note does not require a health condition to reach those extremes before qualifying an older defendant for a sentence reduction, but it does, at least, require the age-related deterioration to be "serious."[9]

---

[7] Courts outside this circuit have utilized this factor to determine whether a defendant qualifies for compassionate release under the Age of Defendant Note. *See, e.g.*, *United States v. Bellamy*, 2019 WL 3340699, at *5 (D. Minn. July 25, 2019) (finding that inmate's "health is seriously deteriorating because of the aging process and that his ability to function in a prison facility is substantially diminished as a result"); *United States v. Johns*, 2019 WL 2646663, at *3 (D. Ariz. June 27, 2019) (holding that inmate "is on the cusp of or is suffering from a serious physical or medical condition and is experiencing deteriorating physical or mental health because of the aging process that substantially diminishes his ability to provide self-care within the BOP and from which he is not expected to recover").

[8] The trend of compassionate release decisions over the past year bears this out. *See, e.g.*, *Beck*, 2019 WL 2716505, at *12 (granting compassionate release for 47 year-old defendant who had cancer that was not timely treated); *United States v. Gray*, 2019 WL 4572816, at *5 (S.D. Ind. Sept. 20, 2019) (granting compassionate release to 64-year old defendant who had been hospitalized for multiple procedures, including one for a liver tumor); *Willis*, 382 F. Supp. 3d at 1189 (granting compassionate release to wheelchair-bound and blind defendant who required 24/7 care and had an estimated 18 months to live).

[9] Courts deciding compassionate release motions made by older defendants have applied standards consistent with this conclusion. *See, e.g.*, *Bellamy*, 2019 WL 3340699, at *3 (granting compassionate release to 71 year-old wheelchair bound defendant who had heart problems, and suffered from diabetic kidney disease, among other

From these differences, two standards become apparent. The Medical Condition Note applies to a defendant younger than 65 who has a specific life-ending or debilitating illness with a predictable, dire short-term prognosis. The Age of Defendant Note, on the other hand, applies to senior-citizen defendants who have already spent over ten years in prison and whose physical and cognitive deterioration has impaired basic human functions without regard to whether their conditions, other than aging, are terminal.[10]

The last statutory requirement—that the reduction is consistent with USSC policy—is essentially already met if "extraordinary and compelling reasons" exist as defined by that policy. The only remaining consideration is the policy statement's requirement that the "defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Relevant factors include the nature of the offense, the history and characteristics of the defendant, and the nature of the danger. *Id.* (incorporating the 18 U.S.C. § 3142(g) factors).

### 2. Section 3553(a) Sentencing Factors

After finding "extraordinary and compelling reasons," a court must then "consider[] the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(1)(A). Those factors include (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the need for the sentence imposed;" (3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" (4) the sentencing guidelines; and (5) "the need to provide restitution to any victims of the offense." 18

---

conditions); *Johns*, 2019 WL 2646663, at *2 (granting compassionate release to 81 year-old suffering from severe heart disease); *United States v. McGraw*, 2019 WL 2059488, at *1–2 (S.D. Ind. May 9, 2019) (granting compassionate release to 72 year-old inmate with limited mobility, diabetes, kidney disease, Hepatitis C, and other issues).

[10]     Judge McMahon's recent decision in *USA v. Israel, III*, 2019 WL 6702522 (S.D.N.Y. Dec. 9, 2019), *appeal filed*, 19-4140, has limited relevance here because the defendant in that case was younger than 65 and therefore not eligible to be evaluated under the Age of Defendant Note.

U.S.C. § 3553(a). The puzzle for this Court is how to apply factors that are meant for imposing a sentence in the context of considering a request for compassionate release. Three points guide the Court's analysis.

First, if a defendant has qualified for compassionate release by way of "extraordinary and compelling reasons," the section 3553(a) factors do not provide additional justifications for reducing the defendant's sentence. Because a sentence is a "final judgment," a subsequent court may not substitute its own assessment of the section 3553(a) factors for the sentencing court's simply because it might disagree with the latter's assessment. *Id.* § 3582(b). It would be improper to rely upon circumstances falling outside the limited ones stated in the statute's sentence-reduction provisions to further justify compassionate release. The sentencing court was empowered to consider all of the 3553(a) factors in the first instance, and did so when it "impose[d] a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Id.* § 3553(a). What justifies compassionate release is a finding that new mitigating "extraordinary and compelling" circumstances exist to reduce that sentence; it is not an opportunity to second guess or to reconsider whether the original sentence was just.

Second, the First Step Act has created tension with Congress's goal of uniform and fair sentencing by giving courts almost total discretion over compassionate release. The compassionate release provisions were first included in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, ch. II, 98 Stat. 1987. Section 3582(c)(1)(A)(i), in particular, was intended to be a "safety valve" to reduce a sentence in the "unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." S. Rep. 98-225, at 121 (1983). But Congress still decided to bifurcate authority between the courts and the BOP, consistent with its intention "to avoid

unwarranted sentence disparities" that had resulted from entrusting sentencing decisions to the sole judgment of the courts. 18 U.S.C. § 3553(a)(6); *see also Booker*, 543 U.S. at 250 (noting that "Congress's basic statutory goal" was to create "a system that diminishes sentencing disparity"). The First Step Act has now again vested sole discretion with the courts. Although Congress's delegation to the USSC to describe what is meant by "extraordinary and compelling reasons" cabins that discretion somewhat, the existence *vel non* of "extraordinary and compelling reasons" determines only whether a defendant can be considered for release—the existence of such reasons does not mandate release. A court may still decide to deny a defendant's motion. 18 U.S.C. § 3582(c)(1)(A). The resulting broad discretion of the district court risks introducing significant disparities in sentences under the rubric of compassionate release.[11]

Third, Congress has made the legislative judgment to increase the use of compassionate release. The section's title, as already noted, unambiguously states as much. In addition, Congress passed the compassionate release amendments amid sustained critique of the BOP's program and failed attempts to reform it. "Until 2013, on average, 'only 24 inmates were released' each year through the BOP program" from a federal prison population of approximately 220,000. *Brown*, 2019 WL 4942051, at *3 (quoting *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice)). In 2013, the Department of Justice Inspector General ("IG") criticized the BOP for using narrow standards and "inconsistent and . . . ad hoc decision making." Office of the Inspector Gen., DOJ, No. I-2013-006, *The*

---

[11]     If that risk substantially materializes, it could undermine respect for law. It would be particularly unfortunate if only well-heeled defendants are in a position to marshal the evidence needed to show that they are entitled to be considered for compassionate release and to marshal the evidence necessary to show that their condition actually favors release.

*Federal Bureau Of Prisons' Compassionate Release Program* 11–12 (2013). Following the IG's report, the BOP reformed its policies, and instances of compassionate release "increased to eighty-three inmates between August 2013 and September 2014 . . . . [But because] Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient." *Brown*, 2019 WL 4942051, at *3.

In sum, in deciding motions for compassionate release, the Court should be wary of using the motion to "correct" the sentencing court's original judgment or introduce unprincipled variance into the execution of duly-imposed sentences, while still honoring Congress's stated intent of increasing the availability of compassionate release. The Court thus finds that, in considering the section 3553(a) factors, it should assess whether those factors outweigh the "extraordinary and compelling reasons" warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence.

### B.    Application

As to Ebbers, the exhaustion requirement is not at issue. In July 2016, Ebbers petitioned the BOP to move for compassionate release on his behalf, and the BOP denied his petition in August 2019. Thus, the Court's decision first turns on whether "extraordinary and compelling reasons" exist to qualify Ebbers for compassionate release.

Understandably,  Ebbers's motion relies most heavily upon the Age of Defendant Note, and the Government agrees that this is the most persuasive aspect of his motion. As to the Age of Defendant Note, only its second requirement—"a serious deterioration in physical or mental health because of the aging process"—is at issue because Ebbers is well over 65 and has served more than ten years of imprisonment. Ebbers has carried his burden of demonstrating that his deteriorating health amounts to extraordinary and compelling circumstances as defined by the Age of Defendant Note, thus qualifying him to be considered for compassionate release.

Shortly after filing his motion, the pace of deterioration of his health quickened. On October 10, 2019, Ebbers was transferred to a 24-hour nursing care unit at FMC Fort Worth because he purported to have memory issues and had been disoriented. In his new unit, he would "receive assistance with daily living." In part he was transferred because inmates had reported that Ebbers had wandered into their cells at night. There had also been earlier incidents of Ebbers being attacked for bumping into inmates. On a test of cognition, Ebbers scored well below the threshold for a diagnosis of dementia.[12] His abnormal weight loss, anemia, and liver function tests were most concerning. Over the course of a year and a half, Ebbers lost 58 pounds. He is six feet and four inches tall, and he weighed 200 pounds on July 12, 2018. By January 17, 2019, Ebbers's weight was down to 187 pounds. By the time of his motion to this Court, Ebbers weighed just 160 pounds. His weight continued to decline despite hospital intervention: he weighed 155 pounds on October 9, 2019, 148 pounds on November 12, 2019, and 142 pounds on December 12, 2019.

Ebbers has also had increasing difficulty walking—to the point that he now requires a walker, wheelchair, or another person's assistance at all times. By November 6, 2019, Ebbers had fallen and suffered head injuries several times. His muscle tissue and body mass had continued to waste away, and he was chronically fatigued and lacked an appetite. BOP staff

---

[12] The BOP has not tested or assessed Ebbers for malingering. Ebbers's phone calls with his daughter showed Ebbers was aware that he was an inmate, could speak of events in his daughter and family's life, and could inquire about the instant motion. Although forgetting the day of the week several times and needing repeated reminders, Ebbers could recall family members' names and expressed concern about cancelling visits, indicating he was too tired and would need several days to recover. The staff psychologist also noted similar discrepancies with how Ebbers presented during their encounters, where he appeared more disoriented. While Ebbers may be suffering from dementia, it does not appear to be crippling (his memory issues may be no more severe than many 78 year-olds), and he may have been exaggerating his symptoms in an effort to increase the likelihood of compassionate release. For those reasons, Ebbers's mental condition is just a small factor in the Court's decision. Had it been a more major consideration (*e.g.*, if Ebbers were physically fit and relying primarily on his allegedly deteriorating mental state) the Court would likely have insisted that he be evaluated for malingering before deciding the motion.

recommended additional measures to prevent falls, including bed rails, reorientation by other staff or inmates, and safety checks.  By November 19, 2019, Ebbers required assistance with activities of daily living, like cleaning, eating, and grooming, and had low albumin and iron levels and high ferritin.  In short, Ebbers was diagnosed as "Cachectic" (muscle atrophy, weakness, and fatigue) with "Wasting Syndrome" (involuntary weight loss).  The BOP ordered an emergency CT scan, continued to press for a colonoscopy that had been previously ordered but not yet been completed, and expressed concern about a potential malignancy.

On November 24, 2019, Ebbers was hospitalized for one week due to low sodium levels (hyponatremia) and altered mental status.  Ebbers was discharged with diagnoses of acute encephalopathy, folate deficiency anemia, ventricular tachycardia, hyponatremia, severe protein calorie malnutrition, coronary artery disease, hyperlipidemia, microcytic anemia hypertension, and congestive heart failure.  By the time he was discharged from the hospital on November 30, 2019, Ebbers's sodium levels had increased and treating doctors recommended consulting with dietary specialists for malnutrition.  After a "not concerning" CT scan prior to his hospital admission, Ebbers was scheduled for a colonoscopy on December 16, 2019.

Ebbers was again hospitalized on December 11, 2019, with altered mental status.  Doctors noted severe wasting and a cachectic appearance of sunken orbitals, hallowed temples, protruding clavicles, wasting hands, and minimal to no muscle definition in his legs.  On December 16, 2019, the Government informed the Court that the scheduled colonoscopy had not taken place because Ebbers's health had "deteriorated" and he had been through "multiple hospitalizations."  The BOP had concluded that "due to his clinical condition/Comorbidities, the risks of EGD/colonoscopy outweigh[ed] the benefits."  Ebbers was released from the hospital,

but on the day of oral argument, December 18, 2019, Ebbers was readmitted to the hospital with low sodium and critically low hemoglobin and hematocrit.

This rapid decline coupled with Ebbers's age present "extraordinary and compelling reasons" under the Age of Defendant Note; the Court next turns to whether a reduction in sentence is compatible with the USSC's policy statements. There is no dispute that Ebbers is not a danger or risk to society. He is sick, weak, disoriented, and bedridden. His ability to care for himself is nearly gone, his cognitive functions are impaired, and his body is wasting away. His remaining time on earth will be spent in end-of-life care, not fashioning fraudulent securities schemes.

Lastly, the Court considers the applicable section 3553(a) factors, and finds they do not outweigh its finding that Ebbers's deteriorating health and old age qualify him for compassionate release. Ebbers's present poor health does not reduce his culpability or diminish the harm he caused. His crimes were egregious; but having been incarcerated from aged 65 to aged 78, during what should have been his golden years, and having reached a point where his quality of life is quite low, releasing Ebbers will not prevent him from being adequately punished nor will it discount the seriousness of his offense or diminish the message that his crimes were unacceptable. It also will not prevent his sentence from serving as a general deterrent to white-collar criminal conduct. Thirteen years of incarceration—up to the point of approaching death—is not a slap on the wrist; it seems likely that no one who might be considering committing accounting fraud would view his sentence as lenient. Far from it—Ebbers has essentially served the life sentence that the sentencing court predicted it had imposed.

The Court also notes that Ebbers's 25-year sentence was significantly longer than most sentences for white-collar crimes—even considering the vast damage his crimes caused—but to

place too much emphasis on this point would be improper.  For it is not this Court's role to retroactively correct sentencing disparities without a Congressional mandate to do so, only to consider whether compassion justifies release under the present circumstances.  If keeping Ebbers in prison would return victims' losses, the decision to do so would be easy.  Unfortunately, it will not.  Ebbers can do no more harm.  The compassionate thing to do in this case is to release Ebbers early, consistent with the intent of Congress when it passed the First Step Act.

## CONCLUSION

For the foregoing reasons the Court granted Ebbers motion for compassionate release, and, prior to reaching that decision, ordered the Government to notify his victims of the proceedings so any who wished to be heard could be.

**Date:  January 8, 2020**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**